# EXHIBIT 1

# EXHIBIT 1

1   *SUMM*
2   GRIFFITH H. HAYES, ESQ.
    Nevada Bar No. 7374
3   MARTIN A. MUCKLEROY, ESQ.
    Nevada Bar No. 9634
4   **COOKSEY, TOOLEN, GAGE, DUFFY & WOOG**
    A Professional Corporation
5   3930 Howard Hughes Parkway, Suite 200
    Las Vegas, Nevada 89169
6   Telephone: (702) 949-3100
    Facsimile: (702)949-3104

7   *Attorneys for Plaintiff*

8

9   **EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**
    **IN AND FOR THE COUNTY OF CLARK COUNTY**

10

11  ROBERT GRABOWSKI, on behalf of          )
12  himself and all others similarly situated, )
                                             )
13              Plaintiff,                   )
                                             )
         v.                                  )   Civil Action No. A·09-602741-C
14                                           )                        XVI
    TIANZHOU DENG, BO HUANG,                 )   **SUMMONS**
15  ROBERT I. ADLER, RENJIE LU,              )
    GREG MARCINKOWSKI, BAOHENG               )
16  SHI, XIANG DONG YANG,                    )
17  SINOENERGY CORP., and SKYWIDE            )
    CAPITAL MANAGEMENT LTD.,                 )
18                                           )
19              Defendants.                  )

20

21

22                              **SUMMONS**

23  **NOTICE!   YOU HAVE BEEN SUED.   THE COURT MAY DECIDE AGAINST YOU**
    **WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS.   READ**
24  **THE INFORMATION BELOW.**

25       **TO THE DEFENDANT:**  A civil Complaint has been filed by the Plaintiff against you for
26  the relief set forth in the Complaint.

                              **SINOENERGY CORP.**

27       1.      If you intend to defend this lawsuit, within 20 days after this Summons is served on
28  you, exclusive of the day of service, you must do the following:

                                        1

(a)      File with the Clerk of this Court, whose address is shown below, a formal written response to the Complaint in accordance with the rules of the Court, with the appropriate filing fee.

(b)      Serve a copy of your response upon the attorney whose name and address is shown below.

2.      Unless you respond, your default will be entered upon application of the Plaintiff and failure to so respond will result in a judgment of default against you for the relief demanded in the Complaint, which could result in the taking of money or property or other relief requested in the Complaint.

3.      If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

4.      The State of Nevada, its political subdivisions, agencies, officers, employees, board members, commission members and legislators each have 45 days after service of this Summons within which to file an Answer or other responsive pleading to the Complaint.

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG          CLERK OF THE COURT

By:                                                    By:
    GRIFFITH H. HAYES, ESQ.                           KADIRA BECK
    Nevada Bar No. 7374                                Deputy Clerk
    MARTIN A. MUCKLEROY, ESQ.                          Regional Justice Center
    Nevada Bar No. 9634                                200 Lewis Ave.
    3930 Howard Hughes Parkway, Suite 200              Las Vegas, NV  89155
    Las Vegas, Nevada 89169

    *Attorneys for Plaintiff, ROBERT GRABOWSKI*



COMP
GRIFFITH H. HAYES, ESQ.
Nevada Bar No. 7374
MARTIN A. MUCKLEROY, ESQ.
Nevada Bar No. 9634
**COOKSEY, TOOLEN, GAGE, DUFFY & WOOG**
A Professional Corporation
3930 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169
Telephone: (702) 949-3100
Facsimile: (702)949-3104

*Attorneys for Plaintiff*

RECEIVED I[N]
EXPRESS BO[X]

2009 OCT 30 P

**FILED AFTER HOURS**

OCT 3 0 2009

STEVEN D. GRIERSON
CLERK OF THE COURT

# EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
## IN AND FOR THE COUNTY OF CLARK COUNTY

ROBERT GRABOWSKI, on behalf of himself and all others similarly situated,

　　　　　　　　Plaintiff,

　　v.

TIANZHOU DENG, BO HUANG, ROBERT I. ADLER, RENJIE LU, GREG MARCINKOWSKI, BAOHENG SHI, XIANG DONG YANG, SINOENERGY CORP., and SKYWIDE CAPITAL MANAGEMENT LTD.,

　　　　　　　　Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. A-09-602741C
XVI

**CLASS ACTION COMPLAINT**

## CLASS ACTION COMPLAINT

Plaintiff, as and for his class action complaint, alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.　Plaintiff brings this action on behalf of the public stockholders of Sinoenergy Corp. ("Sinoenergy" or the "Company") against Defendants, Sinoenergy and its Board of Directors, seeking equitable relief for their breaches of fiduciary duty and other violations of ...

405.0001  1035988.1

1

out of their attempt to sell the Company to Skywide Capital Management Ltd. ("Skywide") by means of an unfair process and for an unfair price (the "Proposed Transaction"). Under the terms of the Proposed Transaction, Sinoenergy shareholders will receive $1.90 per share held in the Company. Proposed Transaction is valued at approximately $30.4 million.

2.      In entering into the Proposed Transaction, the Company has agreed to be taken private by Skywide, an entity owned by Sinoenergy's Chief Executive Officer ("C.E.O.") and Director Bo Huang and its Chairman of the Board of Directors Tianzhou Deng.  As alleged in greater detail *infra*, these specific Defendants have used their control of the members of Sinoenergy's Board of Directors (the "Sinoenergy Board") to capitalize on the downturn in market conditions to force the Sinoenergy Directors to acquiesce to their inadequate proposal to take the Company private.

## PARTIES

3.      Plaintiff Robert Grabowski is, and has been, the owner of shares of common stock of Sinoenergy at all times relevant to this Complaint, and a resident of Alameda County, California

4.      Sinoenergy is a corporation organized and existing under the laws of the State of Nevada. It maintains its principal corporate offices at 1603-1604, Tower B Fortune Centre Ao City, Beiyuan Road, Chaoyang District, Beijing, People's Republic of China 10007.  Sinoenergy is a developer and operator of retail compressed natural gas ("CNG") stations as well as a manufacturer of CNG transport truck trailers, CNG station equipment, and natural gas fuel conversion kits for automobiles, in China. The Company also designs and manufactures a wide variety of customized pressure containers for use in the petroleum and chemical industries.

5.      Defendant Tianzhou Deng ("Deng") has been the Chairman of the Sinoenergy Board since June 2006 and is also a co-owner of Skywide, the company seeking to take Sinoenergy private through the Proposed Transaction.

6.      Defendant Bo Huang ("Huang") has been the C.E.O. and a Director on the Sinoenergy Board since June 2006 and is also a co-owner of Skywide.

7.      Defendant Robert I. Adler ("Adler") has been a Director on the Sinoenergy Board since July 2006.

2

8.     Defendant Renjie Liu ("Liu") has been a Director on the Sinoenergy Board since July 2006.

9.     Defendant Greg Marcinkowski ("Marcinkowski") has been a Director on the Sinoenergy Board since July 2006.

10.    Defendant Baoheng Shi ("Shi") has been a Director on the Sinoenergy Board since July 2006.

11.    Defendant Xiangdong Yang ("Yang") has been a Director on the Sinoenergy Board since May 2008. Yang is also the President of Abax Global Capital. Two subsidiaries of Abax Global Capital hold both guaranteed senior and guaranteed senior convertible notes of the Company, subject to conditions negotiated immediately prior to, and taking effect upon completion of the merger.

12.    Defendants referenced in paragraphs 4 through 11 are collectively referred to as Individual Defendants and/or the Sinoenergy Board.

13.    Skywide is a corporation organized and existing under the laws of the British Virgin Islands and is principally engaged in the business of financial services. It maintains its principal corporate office at 45 Jinhua Road, Qingdao Shanqong, People's Republic of China 266042.

## DEFENDANTS' FIDUCIARY DUTIES

14.    By reason of Individual Defendants' positions with the Company as Directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of Sinoenergy and owe them, as well as the Company, a duty of highest good faith, fair dealing, loyalty and full, candid and adequate disclosure, as well as a duty to maximize shareholder value.

15.    As the majority and controlling shareholder of Sinoenergy, Skywide owed the minority shareholders of Sinoenergy the fiduciary duties of loyalty, due care and good faith.

16.    Skywide and the Individual Defendants, separately and together, in connection with the Proposed Acquisition, violated fiduciary duties owed to Plaintiff and the other public shareholders of Sinoenergy, including their duties of loyalty, good faith and due care. Skywide and the Individual Defendants (to the extent that they were dominated and controlled by Skywide, and/or had an ownership interest in Skywide) stood on both sides of the transaction and engaged in self-

3

1   dealing and benefitted disproportionately by comparison to public shareholders of Sinoenergy.  As a

2   result of Defendants' self-dealing and divided loyalties, neither Plaintiff nor the Class will receive

3   adequate or fair value for their Sinoenergy common stock in the Proposed Transaction.

4        17.   Because Skywide and the Individual Defendants have breached their fiduciary duties

5   in connection with the Proposed Transaction, and because Skywide and the Individual Defendants

6   have a manifest conflict of interest in the Proposed Transaction, the burden of proving the inherent

7   or entire fairness of the Proposed Transaction, including all aspects of its negotiations, structure,

8   price and terms is placed upon the Individual Defendants

9        18.   Where the officers and/or directors of a publicly traded corporation undertake a

10  transaction that will result in either: (i) a change in corporate control; (ii) a break up of the

11  corporation's assets; or (iii) sale of the corporation, the directors have an affirmative fiduciary

12  obligation to obtain the highest value reasonably available for the corporation's shareholders. To

13  diligently comply with their fiduciary duties, the directors and/or officers may not take any action

14  that:

15        a.   adversely affects the value provided to the corporation's shareholders;

16        b.   favors themselves or will discourage or inhibit alternative offers to purchase

17             control of the corporation or its assets;

18        c.   contractually prohibits them from complying with their fiduciary duties;

19        d.   will otherwise adversely affect their duty to search and secure the best value

20             reasonably  available  under  the  circumstances  for  the  corporation's

21             shareholders; and/or

22        e.   will provide the directors and/or officers with preferential treatment at the

23             expense of, or separate from, the public shareholders.

24       19.   In accordance with their duties of loyalty and good faith, the Individual Defendants,

25  as Directors of Sinoenergy, are obligated to refrain from:

26        a.   participating in any transaction where the Directors or officers receive, or are

27             entitled to receive, a personal financial benefit not equally shared by the

28             public shareholders of the corporation; and/or

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

4

b.    unjustly enriching themselves at the expense or to the detriment of the public shareholders.

20.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith and independence owed to Plaintiff and other public shareholders of Sinoenergy, or are aiding and abetting others in violating those duties.

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action on behalf of himself and all other shareholders of the Company (except the Defendants and any person(s), firm(s), trust(s), corporation(s), or other entit(ies) related to or affiliated with Defendants), who are or will be threatened with injury arising from Defendants' actions, as more fully described herein (the "Class").

22.    The members of the Class are so numerous that joiner of all of them would be impracticable.   While the exact number of Class members is unknown to Plaintiff, and can be ascertained only through appropriate discovery, Plaintiff believes there are many thousands of Class members. As of August 12, 2009, Sinoenergy had 15,942,336 shares of common stock outstanding.

23.    Plaintiff's claims are typical of the claims of the Class, since Plaintiff and the other members of the Class have and will sustain damages arising out of Defendants' breaches of their fiduciary duties.   Plaintiff does not have any interests that are adverse or antagonistic to those of the Class.   Plaintiff will fairly and adequately protect the interests of the Class.   Plaintiff is committed to the vigorous prosecution of this action and has retained counsel competent and experienced in this type of litigation.

24.    There are questions of law and fact common to the members of the Class that predominate over any questions which, if they exist, may affect individual class members.   The predominant questions of law and fact include, among others, whether:

a.    the Defendants have and are breaching their fiduciary duties to the detriment of Sinoenergy shareholders;

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

5

405.0001  1035988.1

b.   the Individual Defendants, in connection with the Proposed Transaction of Sinoenergy by Skywide, are pursuing a course of conduct that does not maximize Sinoenergy's value in violation of their fiduciary duties;

c.   the Individual Defendants have misrepresented and omitted material facts in violation of the fiduciary duties owed by them to Plaintiff and the other members of the Class; and

d.   the Class is entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

25.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as individual damages may be relatively small for most members of the Class, the burden and expense of prosecuting litigation of this nature makes it unlikely that members of the Class would prosecute individual actions.  Plaintiff anticipates no difficulty in the management of this action as a class action. Further, the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying results, which may establish incompatible standards of conduct for Defendants.

## SUBSTANTIVE ALLEGATIONS

26.   On October 12, 2009, Sinoenergy announced its intent to be taken private in a merger with Skywide in a deal valued at approximately $30.4 million.  The press release stated in relevant part:

Sinoenergy Corporation (Nasdaq: SNEN), developer and operator of retail compressed natural gas (CNG) filling stations in the People's Republic of China and a manufacturer of CNG transport truck trailer, CNG filling station equipment and CNG fuel conversion kits for automobiles, today announced that, on October 12, 2009, the Company entered into an agreement with Skywide Capital Management Limited, pursuant to which the Company will be merged with and into Skywide. Upon the effectiveness of the merger, each issued and outstanding share of the Company's

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

6

405.0001  1035988.1

common stock, other than shares owned by Skywide, will automatically be converted into the right to receive $1.90 per share.

Skywide, which is owned by the Company's chairman, Mr. Tianzhou Deng, and its president, Mr. Bo Huang, is the Company's largest shareholder, owning approximately 39.06% of the Company's outstanding common stock.

The merger agreement provides that the consummation of the merger is subject to the approval of the holders of a majority of the Company's outstanding common stock and customary closing conditions. As a result of the merger, the Company will cease to exist as a separate corporation, and its common stock will no longer be publicly traded.

The merger was approved by the board of directors, upon the recommendation of a special committee of the board which was comprised solely of independent directors.

27.     Owned by Defendants Deng and Huang, Skywide is the Company's largest share-holder, holding approximately 39.06% of Sinoenergy's common stock.

28.     Due to Defendant Deng's involvement as both the Chairman of the Sinoenergy Board, and co-owner of the buyer, Skywide, Deng has interests in the transaction disparate to those of the Company shareholders, such that Deng cannot adequately and impartially represent the interests of the Company shareholders with regard to the Proposed Transaction.

29.     Due to Defendant Huang's involvement as both C.E.O. of the Company and Director of the Sinoenergy Board, and co-owner of the buyer, Skywide, Huang has interests in the transaction disparate to those of the Company shareholders, such that Huang cannot adequately and impartially represent the interests of the Company shareholders with regard to the Proposed Transaction.

30.     By virtue of its control of Sinoenergy as its controlling shareholder, Skywide must establish the Proposed Transaction's entire fairness, including fair price and fair dealing, in

7

405.0001  1035988.1

1   proceeding with the self-dealing acquisition of Sinoenergy at the expense of the public shareholders.

2   As such, the burden of proving the entire fairness of the Proposed Acquisition, including all aspects

3   of its negotiations, structure, price and terms is placed upon the Individual Defendants and Skywide

4   as a matter of law.

## INTERESTED PARTY TRANSACTION

31.   Defendants Deng and Huang hold unique positions with the Company and have

unmatched knowledge and influence concerning the Company's business and investments.  As

stated in a S-1/A amendment to the Company's Registration Statement, filed with the SEC on

December 31, 2008:

**Because we are dependent on our management, the loss of our key executive officers and the failure to hire additional qualified key personnel could harm our business.**

Our business is largely dependent upon the continued efforts of our chief executive officer, Bo Huang, and our chairman, Tianzhou Deng, who are also directors. We do not have employment contracts with either Mr. Huang or Mr. Deng. The loss of either Mr. Huang, Mr. Deng or any of our other key employees could have a material adverse effect upon our ability to operate profitably. Furthermore, we require additional qualified management and other key personnel for our CNG station business.

***

**Because certain of our stockholders control a significant amount of our common stock, they may have effective control over actions requiring stockholder approval.**

As of December 8, 2008, approximately 40.0% of our outstanding common stock is owned by Skywide Capital Management Limited, which is owned by our chief

8

executive officer, Bo Huang, and our chairman, Tianzhou Deng.   In addition, Abax Lotus, Ltd., of which Xiang Dong (Donald) Yang, one of our directors, has joint voting and dispositive rights, holds shares or common stock and convertible notes which, if converted at the current conversion rate, would result in Abax and Skywide beneficially owning a total of approximately 46.1% of our common stock which could give them the effective ability to approve any action requiring stockholder approval.

32.     Defendants Deng and Huang's critical importance and unique knowledge of the Company make it impossible for the other Directors to adequately protect the interests of the Company's public shareholders.  While it is clear that Huang is able to exert considerable clout over the Sinoenergy Board due to his dual role as C.E.O./Director, Deng's involvement in and knowledge of Sinoenergy also greatly exceeds that of his fellow Sinoenergy Board members.  Deng was the founder and president of Qingdao Sinogas General Machinery Limited Corporation ("Sinogas"), which was acquired by Sinoenergy in June 2006.  Sinogas remains a subsidiary of Sinoenergy, and continues to be involved in Sinoenergy's affairs in the CNG industry.  Indeed, other than Huang, Deng is the only other Director who lists his office as the headquarters of Sinoenergy.  Hence, due to Deng's extensive knowledge and involvement in the affairs of Sinoenergy, he is essentially a *de facto* officer of Sinoenergy.

33.     Not only do Defendants Deng and Huang hold positions of unmatched influence on the Sinoenergy Board, but they also own—through Skywide—nearly 40% of all outstanding shares of Sinoenergy.  Therefore, Defendants Deng and Huang played a substantial role in the negotiation on both sides of the Proposed Transaction.

34.     Further, Defendant Yang, as President of Abax Global Capital, whose affiliate Abax Lotus Ltd. is the lead investor in the Company's $30,000,000 note financing, has interests disparate from those of the Company's public shareholders.  As noted in ¶ 31, Defendant Yang has joint

9

1   voting and dispositive rights and holds shares or common stock and convertible notes which, if

2   converted at the current conversion rate, would result in Abax Global Capital and Skywide

3   beneficially owning a total of approximately 46.1% of the Company's common stock, which could

4   give them the effective ability to approve any action requiring stockholder approval.

5       35.     In addition to the merger between Skywide and Sinoenergy being tainted by an

6   inherent conflict of interest, the agreement signed between Sinoenergy and three holders of

7   guaranteed senior and senior convertible notes (collectively the "Noteholders") also involved inside

8   dealing.  The Company executed the indentures in September 28, 2007.  Of the three Noteholders,

9   two of the entities—Abax Nai Xin A Ltd. and Abax Jade Ltd.—are subsidiaries of the company

10  Abax Global Capital, of which Defendant Yang is the President.

11

12      36.     On October 5, 2009, less than two weeks before the merger agreement was

13  announced, Sinoenergy amended the indenture agreements with the Noteholders.  Under the terms of

14  the amendment, the Noteholders' $16 million in 12% guaranteed senior notes will accelerate, and

15  they shall be paid in full plus interest after the merger.  The parties agreed to renegotiate the terms of

16  the remaining $14 million in 3% guaranteed senior convertible notes to the satisfaction of the

17  Noteholders.  All of the Noteholders' legal fees are to be paid by the Company.

18

19      37.     Due to Defendants Deng, Huang and Yang's involvement, this Proposed Transaction

20  abounds with conflicts of interests.  The C.E.O./Director and the Chairman of the Sinoenergy Board

21  are legally obligated to guard shareholders' interests, which in the context of a sale, means getting

22  the highest price possible.  These same individuals, however, are also trying to buy the Company,

23  and logically want to pay the lowest price possible.  Further, Defendant Yang, a Director and

24  substantial Noteholder whose payment will be accelerated upon consummation of the merger, has

25  interests clearly at odds with those of the public shareholders.

26

27      38.     As if the control over the Sinoenergy Board were not already absolute, the remaining

28  Sinoenergy Board members are ill equipped to protect the interests of Sinoenergy's public

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

shareholders.  First, due to the note agreements, Yang's Abax Global Capital has the right to appoint up to 20% of the members of the Sinoenergy Board, and Deng and Huang agreed to vote their shares in favor of these appointees.  Hence, four out of the seven Directors of the Sinoenergy Board have significant interest in the Proposed Transaction with Skywide.

39.     Of the remaining Directors, Marcinkowski runs a company promoting student educational and performing arts tours, and Adler has been a retired investor since 1973.  Neither of these Directors have expertise in, or first-hand knowledge of the industry in which Sinoenergy operates.

40.     Given Skywide's position as the Company's controlling shareholder and its co-owners Deng and Huang's control over the other members of Sinoenergy Board, Skywide is able to dominate and control the other Directors.  Under the circumstances, none of Sinoenergy's other Directors can be expected to protect the Company's public shareholders in a transaction which benefits Deng and Huang at the expense of the Company's public shareholders.

41.     Because of Skywide's control, no third party, as a practical matter, can attempt any competing bid for the Company as the success of any such bid would require the consent and cooperation of Skywide.

42.     Indeed, studies show that mergers where the purchasers are insiders of the target company provide substantially less consideration to the target company's shareholders.  An August 28, 2008 article in the *New Yorker* highlights the inherent conflict that arises upon the sale of a publicly traded company to insiders. As it noted:

> Since the beginning of 2005, nearly a hundred top-level executives at public companies have participated in management buyouts, or M.B.O.s, joining private-equity investors to buy their companies from shareholders.
>
> *          *          *          *          *
>
> The executives behind these buyouts say that they're the best solution for everyone involved. Investors get a nice bump in the price of their shares-H.C.A. shareholders,

for instance, are getting twenty percent more than the market price- and executive are free from the demands of cautious investors and zealous regulators.

\* \* \* \* \*

*What the executives in these deals don't say is that such buyouts create huge conflicts of interest.* The C.E.O. of a public company is legally obligated to look after shareholders' interests, which in the case of selling the company means getting the highest price possible. But when that same C.E.O. is trying to buy the company, he wants to pay the lowers price possible. Companies try to get around this by having independent members of the board of directors negotiate the deal. In practice, however, directors have generally been appointed by the company's C.E.O. and have spent a good deal of time working with him; they're hardly likely to drive a hard bargain. When the consortium led by Aramark's C.E.O. first bid for the company, for instance, it offered thirty-two dollars a share. After shareholders complained, it upped the bid by $1.80, which directors accepted. Now, that's some real haggling. *A study of buyouts over the past two years suggests that when management is the buyer it pays, on average, thirty percent less than an outside bidder.*

Even more troubling, management buyouts give executives at public companies an incentive not to maximize the value of their companies before the sale. In 1987, for instance, after the textile giant Burlington Industries was taken private by a buyout group that included top Burlington executives, it quickly sold off the company's "nonproductive assets," including ten separate divisions and a host of manufacturing plants, for well over half a billion dollars. The executives could have done those deals while Burlington was a public company. But doing them after the buyout, when they owned more of the firm, meant that they reaped more of the benefits. Similarly, management buyouts are often associated with major restructurings to make companies leaner and more profitable. With few exceptions, these restructurings could be done before buyouts. But they're not, in part because executives would rather wait until they own a bigger chunk of the company. A study of buyouts in the U.K., for instance, found that C.E.O.s who planned to buy their own companies were less likely to embark on restructuring than C.E.O.s who weren't.

*Also, executives, before making a buyout offer, use accounting gimmicks to make their company's performance look worse than it really is.* In a study of more than sixty companies that went private, Sharon Katz, of the Harvard Business School, found that, in the two years preceding a management buyout, companies recorded lower than expected accounts receivable, which drove profits down. Similarly, a study by tow accounting professors found that executives pursuing M.B.O.s tended to accelerate the recognition of revenue, making their companies' performance. But these studies suggest that part of the reason is that executives were making them look bad while they were public.

\* \* \* \* \*

But if management buyouts were really about the virtues of private ownership you'd expect companies that go private to stay private. The reality, though, is that, with high-profile deals, this rarely happens. Instead, after a company has been buffed and shines, it's generally taken public again. Both H.C.A. and Aramark, in fact, have gone

12

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

from public to private to public, and now are private again. This suggests that management buyouts are often simply an opportunity for insiders to pick up assets on the cheap and flip them a few years later for fantastic sums. Over the past fifteen years, public companies have come up with ever more lavish performance-related pay packages, in the hopes of giving C.E.O.'s enough incentive to do their jobs and look after shareholders' interests. But why expect someone to be happy with tens of millions of dollars for putting shareholders first when he can get hundreds of millions for putting them last? (emphasis added)

43.   Further, as *The Wall Street Journal* reported on September 8, 2006, the process through which a Company is sold to insiders is generally skewed in favor of the Company's management. The Wall Street Journal article highlights this conflict as follows:

In such cases [where a company is being sold to management], management, with all its detailed knowledge of the company, goes from being a seller striving for a high price to being a buyer looking for an attractive price. Usually the sale of a public company involves an auction or a competitive-bidding process. But when management [is involved], there often isn't such an open procedure, and the process is especially fraught with potential conflicts of interest.

* * * * * * * * * *

While some boards are diligent in vetting deals, the process sometimes is skewed in favor of a sale. For example, there usually is a period when other bidders can come forth with offers. But if that window is short, the likelihood of a rival bid emerging isn't large, since potential buyers won't have time to perform due diligence. Special committees charged with weighing deals also can set breakup fees that make rival bidders pay dearly to get rid of the original buyer. (emphasis added)

44.   The terms of the Proposed Acquisition are grossly unfair to the Class. This unfairness is compounded by the gross disparity between the knowledge and information possessed by Skywide by virtue of its position of control of the Company and that possessed by the Company's public shareholders. Skywide's intent is to take advantage of this disparity and to induce class members to relinquish their shares in the Company at an inadequate price on the basis of incomplete and inadequate information.

## THE PRICE IS UNFAIR

45.   In the few months prior to the Proposed Transaction, Sinoenergy stock had been trading well in excess of the Proposed Transaction offer price of $1.90. In fact, Sinoenergy's stock

405.0001 1035988.1

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

1   traded at $2.63 per share as recently as August 11, 2009 and as high as $3.76 per share in October

2   2008, almost double the offer price.

3       46.     This price is unfair, considering that the book value of the Company's stock was

4   $3.53, nearly double the $1.90 price offered by the Company.  Additionally, in its most recent 10Q

5   filed on August 14, 2009, the Company had $12.2 million of cash on hand.  Once the Company's

6   cash is deducted from the $30.3 million offer, the remaining $18.1 million divided by the nearly 16

7   million outstanding shares equals a net cash offer of only $1.13 per share, well below the offer price.

8   Therefore, the offer price of $1.90 does not adequately represent the economic realities of the

9   Company.

## THE PRECLUSIVE DEAL PROTECTION DEVICES

11      47.     As part of the Merger Agreement, Defendants agreed to certain onerous and

12  preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait*

13  *accompli* and ensure that no competing offers will emerge for the Company.

14      48.     Moreover, Defendants agreed to such terms without any hard evidence that they

15  sought a third party buyer for Sinoenergy and no evidence that Sinoenergy's Directors shopped the

16  Company in order to obtain the best possible (higher) price for Sinoenergy's shareholders.

17      49.     First, the Merger Agreement contains a strict "no shop" provision prohibiting the

18  members of the Sinoenergy Board from taking any affirmative action to comply with their fiduciary

19  duties to maximize shareholder value, including soliciting proposals relating to alternative tender

20  offer or business combinations.  The Merger Agreement also includes a strict "standstill" provision

21  which prohibits, except under extremely limited circumstances, the Defendants from even engaging

22  in discussions or negotiations relating to alternative business combinations.  In addition to the "no

23  shop" and "standstill" provisions, the Merger Agreement includes a $500,000 termination fee should

24  the Board choose to accept a superior deal. The termination fee in combination with the preclusive

25  deal protection devices will all but ensure that no competing offer will be forthcoming.

26      50.     Section 7.1(a) of the Merger Agreement severely restricts the Board's ability to enter

27  into discussions and negotiations involving a competing unsolicited bid.  It requires the Board to (i)

28

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

notify Skywide of any unsolicited bid; (ii) determine, after consultation with outside financial advisors and legal counsel, that the failure to take such action would violate its fiduciary duties; (iii) give Skywide notice to the effect that the Company is entering into discussions or negotiations with another bidder; (iv) receive from the bidder an executed confidentiality agreement prior to providing access to information; and (v) keep Skywide promptly informed of the status of any discussions or negotiations with other bidders.

51.     Further, Section 7.1(b) provides that should the Board decide to pursue an alternative proposal, the Board must (i) provide Skywide with all material non-public information relating to the alternative acquisition proposal; (ii) pay the $500,000 termination fee; and (iii) provide Skywide with written notice of the Board's intent to accept the alternative acquisition proposal, specifying the material terms and conditions of the proposal at least three business days prior to the time the action is to be taken, during which the Company is required to negotiate in good faith with Skywide so that Skywide may propose a modification to the Merger Agreement, such that the alternative acquisition proposal would no longer be a superior proposal. These provisions further discourage bidders from making a competing bid for the Company.

52.     Thus, even if the Sinoenergy Board receives an intervening bid that appeared to be "superior" to Skywide's offer, they are precluded from even entering into discussions and negotiations unless they first reasonably determine in good faith that the alternative proposal is, in fact, "superior." Consequently, this provision prevents the Sinoenergy Board from exercising their fiduciary duties and precludes an investigation into competing proposals unless, as a prerequisite, the majority of the Sinoenergy Board first determines that the proposal is superior.

53.     In addition to the unreasonably high standard that must be met for the Board to even consider a competing bid, the Company must also notify Skywide promptly before recommending to accept that alternative bid, giving Skywide an opportunity to match the terms of any competing bid.

15

1    Obviously, no potential bidder will waste time and resources to make a competing bid that Skywide

2    can simply match.

3    Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that

4    Company shareholders will continue to suffer absent judicial intervention.

5

6                                          **COUNT I**

7                              **BREACH OF FIDUCIARY DUTY**

8                            **(Against the Individual Defendants)**

9        54.    Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

10        55.    As Directors of Sinoenergy, the Individual Defendants stand in a fiduciary

11    relationship to Plaintiff and the other public stockholders of the Company and owe them the highest

12    fiduciary obligations of loyalty and care.  The Individual Defendants' recommendation of the

13    Proposed Transaction will result in a change of control of the Company which imposes heightened

14    fiduciary responsibilities to maximize Sinoenergy's value for the benefit of the stockholders and

15    requires enhanced scrutiny by the Court.

16        56.    As discussed herein, the Individual Defendants have breached their fiduciary duties to

17    Sinoenergy shareholders by failing to engage in an honest and fair sale process.

18        57.    As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff

19    and the Class will suffer irreparable injury in that they have not and will not receive their fair portion

20    of the value of Sinoenergy's assets and will be prevented from benefiting from a value-maximizing

21    transaction.

22        58.    Unless enjoined by this Court, the Individual Defendants will continue to breach their

23    fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to

24    the irreparable harm of the Class.

25        59.    Plaintiff and the Class have no adequate remedy at law.

26                                          **COUNT II**

27                              **BREACH OF FIDUCIARY DUTY**

28                            **(Against Skywide as Controlling Shareholder)**

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

405.0001  1035988.1                        16

60.     Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

61.     As the controlling shareholder of Sinoenergy, Defendant Skywide owes Sinoenergy's public shareholders the fiduciary duties of care, loyalty and good faith.

62.     Skywide has violated its fiduciary duties owed to Sinoenergy's public shareholders and have acted to put its own interests ahead of the interests of Sinoenergy's shareholders.

63.     By the acts, transactions and courses of conduct alleged herein, Skywide is attempting to advance its interests at the unfair expense of Plaintiff and other members of the Class.

64.     Skywide has violated and continues to violate its fiduciary duties by attempting to enter into a transaction without regard to the fairness of the transaction to Sinoenergy's public shareholders.

65.     Because Skywide dominates and controls the business and corporate affairs of Sinoenergy, and is in possession of private corporate information concerning Sinoenergy's assets, business and future prospects and the costs of their own liability, there exists an imbalance and disparity of knowledge and economic power between Skywide and the public shareholders of Sinoenergy which makes it inherently unfair for Skywide to pursue any Proposed Transaction wherein it will reap disproportionate benefits.

66.     Plaintiff and the Class will suffer irreparable injury as a result of Individual Defendants' self-dealing.

67.     Unless enjoined by this Court, Skywide will continue to breach its fiduciary duties owed to Plaintiff and the Class, and will consummate the Proposed Transaction without affording Plaintiff and the Class a meaningful vote.

68.     Plaintiff and the members of the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

69.     As a result, Plaintiff and the Class have been and will be damaged.

17

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG

## COUNT III

### AIDING AND ABETTING

#### (Against Sinoenergy and Skywide)

70.     Plaintiff repeats all previous allegations as if set forth in full herein.

71.     As alleged in more detail above, Sinoenergy and Skywide are well aware that the Individual Defendants have not sought to obtain the best available transaction for the Company's public shareholders.   Defendants Sinoenergy and Skywide aided and abetted the Individual Defendants' breaches of fiduciary duties.

72.     As a result, Plaintiff and the Class members are being harmed.

73.     Plaintiff and the Class have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper class action under Nevada Civil Rule 23 and certifying Plaintiff as Class representative and his counsel as Class counsel;

B.      Declaring that the Defendants have breached their fiduciary duties to Plaintiff and the Class;

C.      Enjoining preliminarily and permanently the Defendants from consummating the Proposed Transaction;

D.      In the event that the transaction is consummated prior to the entry of this Court's final judgment, awarding Plaintiff and the class compensatory and/or rescissory damages as allowed by law;

E.      Directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties

F.      Awarding interest, attorney's fees, expert fees and other costs, in an amount to be determined; and

18

COOKSEY, TOOLEN, GAGE, DUFFY & WOOG